UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.   CASE NO. 8:25-cr-327-WFJ-AAS
**UNDER SEAL**

JORGE LUIS HERNANDEZ VILLAZON

**MOTION AND MEMORANDUM OF LAW FOR
<u>CONFLICT OF INTEREST INQUIRY</u>**

The United States requests an inquiry on whether Silvia Pinera-Vazquez (Defense Counsel) has an unwaivable conflict in the continued representation of Jorge Luis Hernandez Villazon (Defendant). The request for inquiry is appropriate for two reasons.

<u>First</u>, the United States intends to seek authorization to serve Defense Counsel with a subpoena for testimony in this case and considers her a subject within the scope of the investigation. Information the United States received during the investigation revealed that Defense Counsel met with two of the anticipated trial witnesses after the Defendant referred them to her and after the Defendant made materially false representations of the sentences that the potential clients would serve. With at least one of those witnesses, Defense Counsel met with the potential witness and presented him with a retention agreement for $1 million which, if paid, would be shared among Defense Counsel, the Defendant, and others. Moreover, the United States is aware of Defense Counsel representing a material witness who is awaiting extradition to the District of Puerto Rico from Colombia, though the

undersigned is unaware of whether she has filed a notice of appearance in that case or when that potential witness shall be extradited.

Second, because the United States' anticipated testimony and evidence presented at trial will involve references to Defense Counsel, the caselaw supports that the public's right to a fair trial and the Defendant's Sixth Amendment rights will be affected. For example, anticipated testimony includes admissions of the Defendant to a coconspirator of payments to Defense Counsel and the sharing of information about drug traffickers between the Defendant and Defense Counsel. The Defendant also told a coconspirator that if law enforcement contacted him, that coconspirator should advise the Defendant so that Defense Counsel could represent him. Finally, the Defendant told a coconspirator after knowing he was under investigation that, "If there is a problem with me, I will go to trial. I want the witnesses to testify to see who they are. I have a lot of money, and I will have them killed."

The undersigned and the U.S. Attorney's Office for the Southern District of Florida have advised Defense Counsel since the Defendant's initial appearance of a conflict in continued representation. Court intervention is now necessary.

## BACKGROUND

The Defendant is charged in a one-count indictment for conspiracy to commit wire fraud. The United States alleges a multi-year conspiracy to solicit drug traffickers facing up to a lifetime of imprisonment with promises of sentences of no more than a few years in exchange for payments in upwards of $1 million. The

Defendant used coconspirators living in Colombia to collect money, vehicles, and property titles to cover the costs he quoted. He did not provide the results promised to these traffickers and they often received sentences far higher than what was promised. At times, the Defendant's fees he quoted to traffickers were outside the fee retention agreements made with domestic defense attorneys, even though the cash and property that the Defendant and his coconspirators collected was intended to be shared with those attorneys, to include Defense Counsel.

Hernandez also obtained a paralegal certification, which he used to obtain access to jails to conduct privileged visits with traffickers. In one such visit the inmate permitted to be recorded, Hernandez detailed how he would use his network of informants to pass information to a third party for the inmate's benefit which could then be falsely presented as the third party's own.

This scheme included the participation of attorneys here and abroad, many of whom are probable witnesses. Defense Counsel is a subject of this investigation and is anticipated to be among the witnesses the United States expects to seek approval to subpoena for testimony. A conflict inquiry is appropriate because of the likelihood of the United States seeking the compulsion of counsel's testimony as well as the potential negative impact on the public's right to a fair trial and the Defendant's Sixth Amendment rights through continued representation.

The following are proffers of information on what the United States believes certain witnesses will testify to if called at trial.

### A. Individual 1

One of the traffickers, Individual 1, is expected to testify that Defense Counsel approached him while awaiting his initial appearance in court. She described that she was contracted on behalf of "Boli" (the Defendant's alias). About a week after Individual 1's arrival in the United States, the Defendant contacted Individual 1's spouse. In that call, the Defendant described that if paid, the Defendant would work everything out and the maximum sentence Individual 1 would receive in prison was three years. The Defendant gave Individual 1's wife his phone number, which Individual 1 used to contact the Defendant from jail. The Defendant maintained that the call could not be recorded or monitored because it was a privileged call; he further provided Defense Counsel's name and Florida Bar number. Finally, the Defendant told Individual 1 that he was well-versed with "the system," that he was "friends" with the prosecutor, and that he could work out Individual 1's case.

About three days after this call, the Defendant's wife—who also has a paralegal certification—met with Individual 1 in jail to discuss the fee contract. According to Individual 1, the Defendant's wife was acting as a paralegal for Defense Counsel. During their meeting, the Defendant's wife told Individual 1 that he could not be seen with the Defendant; otherwise, Individual 1 would be labeled a "snitch." Individual 1 recalled meeting twice with the Defendant's wife while in jail.

Following Individual 1's failure to hire Defense Counsel for his arraignment, the Defendant spoke with Individual 1's wife. The Defendant told her that she needed to reason with Individual 1; otherwise, Individual 1 would die in prison. In a

4

later call, the Defendant told Individual 1's wife that he was surveilling her and knew where she was at all times.

About a month after arriving in Miami, Defense Counsel approached Individual 1 in jail with a contract for legal services totaling $1 million. Accompanying her was Coconspirator 1, a Colombian attorney. During a subsequent attorney visit in jail, Defense Counsel asked whether Individual 1 signed the contract and paid. Individual 1 responded that he could not pay the amount requested but offered between $100,000 and $250,000. During one of the meetings and after saying he was unable to meet the $1 million fee, Individual 1 recalled Defense Counsel telling him that he needed to come to an agreement with "the person who brought me to you" (the Defendant). Coconspirator 1 accompanied Defense Counsel to the Miami jail on two occasions to meet with Individual 1.

In all, Individual 1 reported seeing Defense Counsel in court as well as meeting with her in two or three jail visits.

### B. Individual 2

Individual 2's anticipated testimony includes the Defendant reaching out to his sister in or around 2020 to advise that there was an extradition order for him and that the Defendant wanted to help.

The Defendant was at the courthouse during Individual 2's initial appearance. Months later, Individual 2 was told that he had an attorney visit and saw the Defendant there in the attorney visitation room instead of his counsel. The Defendant claimed that he was there to help Individual 2 and described how he had

5

assisted a different trafficker in getting one year of incarceration, the entirety of which was spent on house arrest. When Individual 2 asked how much it would cost to get a similar sentence, the Defendant replied that it would be costly but that he would check.

During the meeting, Individual 2 asked how the Defendant would be able to help him. The Defendant told Individual 2 that "we will have to find you an attorney…I don't work with [Individual 2's counsel]." The price quoted to Individual 2 for the Defendant's "services" was $750,000 and that cash, property, cars, and other assets in Colombia could be accepted as forms of payment. The Defendant recommended Defense Counsel, whom he referred to as "Silvia." Individual 2 recounted that Defense Counsel had visited him in the jail.

### C. Individual 3

Individual 3 is anticipated to testify to having worked for several years with a client of Defense Counsel's (Client 1) who is facing extradition to the District of Puerto Rico. The Defendant spoke with Individual 3 on behalf of Client 1 while Individual 3 was in custody awaiting extradition.

During the call, the Defendant held himself out as an attorney with a team in Miami. The Defendant further claimed that he could leverage his contacts within the DEA and U.S. Attorney's Office to secure a sentence between three and four years. Individual 3 was extradited to Puerto Rico soon after.[1]

---

[1] Individual 3's attorney was a Puerto Rico-based defense attorney, not Defense Counsel.

In or around February 2023 and September 2023, Individual 3 and Client 1 arranged to send the Defendant $350,000. The first payment was for $150,000 and the second for $200,000.

### D. Individual 4

If called to testify, Individual 4 is anticipated to recount the Defendant charging about $1 million to Client 1. Of this, the equivalent of about $170,000 was for Defense Counsel. The Defendant promised Client 1 zero days in jail, but Client 1 laughed at him and said he was willing to go to prison for five years.

Individual 4 knew about the promises the Defendant made to clients, and how the Defendant did not want Defense Counsel or other domestic defense attorneys to know what he was charging. The Defendant told Individual 4 in or around January 2025 that he knew he was under investigation. During that conversation, the Defendant said, "If there is a problem with me, I will go to trial. I want the witnesses to testify to see who they are. I have a lot of money and I will have them killed."

### E. Additional Background

The Defendant's Pretrial Services Report disclosed that he was employed with Defense Counsel's law firm; however, during the Defendant's detention hearing in Ft. Lauderdale, Defense Counsel corrected the report to say "[h]e works for a company called Hernandez De [Luque], who has done business with my firm on a case-by-case basis, but he is not an employee of my firm and has never been an employee of my law firm." Doc. 16-2 at 54:19-22. The Report also recorded that Defense Counsel pays him $20,000 per month, but that figure was disputed and there

7

was no clarification on the extant financial relationship between the Defendant and Defense Counsel's firm. *Id.* at 54:24-55:7.

As detailed below, the United States asks this Court to conclude that the defense team; to include attorneys and any associated investigators, paralegals, or other agents of the attorney have unwaivable conflicts and must be disqualified from this case. In the alternative, the United States asks this Court to conduct an inquiry with the Defendant to ensure he understands the potential conflicts of interest in this case and can waive them if he wishes.

## MEMORANDUM OF LAW AND ANALYSIS

### A. Defense Counsel's Visits with Anticipated Witnesses, Her Ongoing Representation of a Potential Witness, and Her Anticipated Designation as a Trial Witness

The right to counsel of one's choice "is subordinate to the requirements of efficient and orderly administration of justice." *United States v. McCutcheon*, 86 F.3d 187, 189 (11th Cir. 1996). As a result, this Court has "broad discretion" to determine whether actual or potential conflicts of interest between a defendant and his attorney require disqualification. *See Wheat v. United States*, 486 U.S. 153, 163 (1987). In determining whether to disqualify Defense Counsel, this Court must balance's right to be represented by counsel of his choice and his right to an attorney who is free of conflicts of interest.

An actual conflict of interest exists "when defense counsel has independent personal information regarding the facts underlying [her] client's charges." *United*

8

*States v. Ross*, 33 F.3d 1507, 1523 n.29 (11th Cir. 1994) (quoting *Government of the Virgin Islands v. Zepp*, 748 F.2d 125, 136 (3d Cir. 1984)); *Smith v. White*, 815 F.2d 1401, 1405 (11th Cir. 1987) ("An 'actual conflict' of interest occurs when a lawyer has 'inconsistent interests.'"). When counsel for the defendant in a criminal investigation is also a subject of that same inquiry, disqualification is an absolute. *E.g.*, *United States v. Reeves*, 892 F.2d 1223, 1227 (5th Cir. 1990). The United States does not need to produce direct evidence of an actual conflict of interest. *United States v. Register*, 182 F.3d 820, 828 (11th Cir. 1999).

"The need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when [s]he previously represented a person who will be called as a witness against a current client at a criminal trial." *Ross*, 33 F.3d at 1523. This is not a formalistic requirement of retention and a notice of appearance to the court. A person who discloses facts to a lawyer to determine if the lawyer will accept a case may be entitled to the privilege. *See, e.g.*, *United States v. Dennis*, 843 F.2d 652, 656 (2d Cir. 1988).

Here, Defense Counsel's participation in meetings with at least two anticipated witnesses and her representation of another potential witness presents an unwaivable actual conflict. This motion is not premised around just the Defendant making referrals for his attorney of choice. Indeed, she secured a favorable result for her client in his federal money laundering case in the Southern District of New York and it would be inexplicable if the Defendant did <u>not</u> recommend his attorney on

that alone. However, the indictment and proffered evidence does show that the Defendant made materially false statements to these traffickers, sought to profit from these statements, and referred traffickers to Defense Counsel to profit off his representations. If privileged communications took place between a witness and Defense Counsel, who then is a witness against Defense Counsel's current client, the successive representation creates a textbook conflict. That the anticipated trial witnesses never retained Defense Counsel is of little value so long as confidential communications took place. In such circumstances, there is an irrebuttable presumption of privileged communications when the present and prior representations are substantially related. *Freund v. Butterworth*, 165 F.3d 839, 859-60 (11th Cir. 1999).

 Defense Counsel's meetings with Individuals 1 and 2 upon the Defendant's referral are substantially related to the current case. The central theme of the charged conspiracy is that the Defendant solicited traffickers to pay substantial sums in exchange for a lower sentence. He referred Defense Counsel and other attorneys to these traffickers. By these referrals, Defense Counsel and other attorneys were to accrue financial benefits through the business being brought to them. The referrals cannot be decoupled from the charged conduct that is the subject of the representation.

 And because of this relationship, Defense Counsel and the other attorneys to whom the Defendant referred business would be foreseeable witnesses at trial against him. Indeed, the Pretrial Services Report documents the Defendant's representations

that there is an extant financial relationship between him and Defense Counsel, notwithstanding disputes on the Defendant's employment status with Defense Counsel's law firm and how much he has been paid. Doc. 16-2 at 54:19-55:7. It is appropriate to make inquiries on how much money the Defendant intended to make through these referrals, how much Defense Counsel was intended to make from the same, whether the Defendant told Defense Counsel about any of the representations he made, and what measures the Defendant intended to use to reduce clients' sentences. An actual conflict exists when a client uses the services of his attorney to further a crime or fraud, regardless of whether the attorney knew about it. *See United States v. Weiss*, 539 Fed. Appx. 952, 955 (11th Cir. 2013).

When the charged conduct includes independent personal information known to counsel regarding the facts, "the justice system has an interest in not having a defense attorney be both advocate and witness regarding material issues." *United States v. Defazio*, 899 F.2d 626, 631 (7th Cir. 1990) (citing the Model Rules of Professional Conduct, Rule 3.7 Comment). The Court should hold an inquiry to enforce that interest.

### B. The Impact of Continued Representation on the Public and Defendant's Right to a Fair Trial

The proffered evidence supports that Defense Counsel has independent personal information regarding the allegations in the Indictment. A failure, then, to act in this circumstance creates an "unsworn witness" at trial. This arises when an attorney representing a client has personal knowledge of the relevant events but does

not testify under oath. *See, e.g.*, *Defazio*, 899 F.2d at 629-632 (11th Cir. 1990). The "unsworn witness" places the jury in the position of considering the implication of Defense Counsel's dual role as a witness and co-actor in the charged conduct, while defending a client in that conduct. It both denies the United States a potential witness at trial and raises the inference to the jury that the conduct under scrutiny may even be permissible, compromising the integrity and fairness of the jail.

  This happened in *United States v. Gouaz*. 2003 WL 22862653 (S.D. Fla. 2003). There, the trial court was confronted with a defendant wanting to present a defense of good faith reliance upon the advice of counsel, without identifying the counsel who provided the advice. Allowing such a defense to proceed would lead the jury to assume that trial counsel was the one who gave the defendant the advice, "and to discount the significance of the Government's evidence." *Id*. at *4; (citing *United States v. Gotti*, 737 F. Supp. 737, 741 (E.D.N.Y. 1992) (disqualifying defense counsel who had first-hand involvement with certain evidence, saying that counsel's presence "could readily serve as a signal to the jury that the court discounts the government's proof on this point – that the court does not believe this evidence").

  The *Gouaz* court further answered whether the conflict question changes if a potential witness could be adverse to the United States. Though initially of the opinion that defense counsel would only serve to corroborate the defendant's testimony, the court reconsidered:

> [i]f the prosecution is otherwise justified in calling an attorney as a witness, it is inconceivable that Defendant's right to a particular counsel

12

> should be permitted to impose…artificial disadvantages upon the government, by restricting whom it can call at trial.

*Id*. at *4 (internal citations and quotations omitted). Here, the nexus between the Defendant's referrals of Defense Counsel to traffickers, his proffered false representations to them of the sentences they would receive, and any communications made to Defense Counsel germane to those referrals are relevant to both the existing Indictment and a subject of further inquiry in the investigation.

Having identified these conflicts for this Court's consideration, the United States contends that the balance of interests weighs in favor of removing Attorney Pinera-Vazquez from the case, even if Hernandez Villazon were to seek to waive the conflict. This Court has "substantial latitude [to refuse] waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in more common cases where the potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *See Wheat*, 486 U.S. at 163. While there is a presumption in favor of the Defendant's counsel of choice, that presumption may be "overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Id.* at 164.

If this Court finds that Hernandez Villazon should be permitted to waive these conflicts, the United States asks that this Court conduct a full inquiry of his waiver on the record to ensure that it is knowing, voluntary, and intelligent. A similar inquiry was conducted in *United States v. Graham*, 493 F. App'x 162, 166 (2d Cir. 2012), *cert. granted, judgment vacated on other grounds*, 570 U.S. 913 (2013). The United

13

States requests in the alternative that this Court conduct such an inquiry with Hernandez Villazon here to determine if he wishes to waive these conflicts.

## CONCLUSION

The United States asks this Court to conclude that the defense team; to include Attorney Silvia Pinera-Vazquez and any associated attorneys, paralegals, or other agents of the attorney have unwaivable conflicts and must be disqualified from this case. In the alternative, the United States asks this Court to conduct an inquiry with the Defendant to ensure he understands the potential conflicts of interest in this case and can waive them if he wishes.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By: /s/ *Daniel Baeza*
Daniel Baeza
Assistant United States Attorney
USAO No. 164
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Daniel.Baeza@usdoj.gov

U.S. v. Hernandez Villazon          Case No. 8:25-cr-327-WFJ-AAS

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2025, I served a true copy of the foregoing underseal to the Court and the following:

Defense Counsel of Record

/s/ *Daniel Baeza*
Daniel Baeza
Assistant United States Attorney
USAO No. 164
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:  (813) 274-6000
Facsimile:   (813) 274-6358
E-mail:       Daniel.Baeza@usdoj.gov