UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 8:25-cr-327-WFJ-AAS

JORGE LUIS HERNANDEZ VILLAZON


### RESPONSE IN OPPOSITION TO MOTION TO DISMISS

The Defendant's Motion to Dismiss should be denied. Federal Rule of Criminal Procedure 12(b) does not require pleading specific misrepresentations in an indictment to support a § 1349 offense and the Court can deny the motion on that principle alone.

The Indictment pleads the essential elements of the offense and informs the defendant of the allegations against him.[1] The defendant's claim that the Indictment fails to plead the essential elements of a wire fraud conspiracy is unpersuasive in light of its reliance on a case that the Supreme Court expressly abrogated before the defendant's arrest.

Hernandez's claim that the indictment violates the Sixth Amendment also falls short. Save for the safe harbor affirmative defense for certain money laundering offenses, *see* 18 U.S.C. § 1957(f)(1), there is no categorical exemption in either the

---

[1] On April 9, 2025, a grand jury returned a superseding indictment against Hernandez Villazon that includes an additional count for conspiring to commit money laundering. Though the motion to dismiss can be procedurally denied as moot, the wire fraud conspiracy remains in the superseding indictment.

wire fraud or money laundering statutes for the conduct alleged in the Superseding Indictment.

## PROCEDURAL AND FACTUAL BACKGROUND

This case puts a spotlight on the role of "fixers" in the arena of international drug trafficking cases and the contortions used to legitimize their behavior.[2] Hernandez was one such fixer, connecting high-level drug traffickers facing substantial penalties in the United States with defense attorneys.

But connecting traffickers with attorneys is not the issue here. Rather, it is about the representations the defendant made to high-level traffickers about the sentences *he* could get for them through *his* connections in exchange for payments *he* coordinated that *he* did not disclose to domestic defense attorneys; the false statements *he* made to defendants and their families in furtherance of the scheme to collect more money; the use of *his* informants to funnel information that can be presented as the cooperator's own; and *his* knowledge of third-party cooperation being unapproved in cases.

The United States alleges a multi-year conspiracy to solicit drug traffickers facing extradition and prosecution in the United States with substantial reductions in their potential sentences in exchange for payments in upwards of $1 million. Doc. 6

---

[2] The defendant's involvement in such arrangements is in the public domain, including the below article referencing his money laundering case in the Southern District of New York. "The Professor and the Fixer: How a Colombian Middleman Got a Crime Specialist to Launder Money," *available at* https://insightcrime.org/news/professor-fixer-colombia-middleman-crime-specialist-launder-money/ (last accessed on April 8, 2026).

at ¶ 11.[3] Hernandez is alleged to have made promises to defendants facing charges in multiple districts of short sentences in exchange for cash, real property, and cars, and coconspirators collected that property, which was at times placed in the names of third-parties. *Id.* at ¶ 12(a)-(f). He also had sub-sources in Colombia who provided information about drug smuggling that he offered as third-party cooperators even though third-party cooperation was not approved. *Id.* at ¶ 12(g)-(i), (k).

Hernandez got a paralegal certification and said he worked for legal teams. The American Bar Association defines a paralegal as "a person, qualified by education, training or work experience who is employed or retained by a lawyer, law office, corporation, governmental agency or other entity and who performs specifically delegated substantive legal work." *See* CURRENT ABA DEFINITION OF PARALEGAL, https://www.americanbar.org/groups/paralegals/profession-information/current_aba_definition_of_legal_assistant_paralegal/ (last accessed on April 8, 2026). The use of the "paralegal" moniker to circumvent otherwise inappropriate conduct is not of recent vintage. For example, its use was boasted of in Netflix's episodic documentary "Cocaine Cowboys" when conspirators used that label to get into jail for meetings with Miami drug kingpins Willy Falcone and Sal Magluta while they were awaiting trial. *Cocaine Cowboys, Episode 2: 75 Tons*, Netflix (2021). This case is a variation and evolution of that theme.

---

[3] Since the original indictment, investigators identified at least one material witness—represented by defense counsel in his/her pending federal cases—who was quoted a fee of about $2 million.

The evidence in this case is anticipated to show that for at least two of the traffickers who made payments, Hernandez was not part of the legal team, did not conduct paralegal work, and withheld information to the defense attorney about the money he was collecting for himself. In a consensually recorded meeting with a cooperating trafficker, Hernandez, who had previously quoted a fee of about $750,000 for his services, discussed providing informants to supply information for the trafficker's benefit. As described in the indictment, third-party cooperation is subject to strict oversight because of its potential for abuse.

## **ARGUMENT**

### **I.     The Indictment Pleads a Conspiracy to Commit Wire Fraud**

A proper indictment "presents the essential elements of the charged offense," "notifies the accused of the charges to be defended against," and "enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009) (per curiam). Thus, an indictment is sufficient when it tracks the language of the statute and "as long as it also provides a statement of facts and circumstances that give notice of the offense to the accused." *Id*. at 1246 (internal quotation marks omitted). However, the indictment does not need to "allege in detail the factual proof that will be relied upon to support the charges." *United States v. Sharpe*, 438 F.3d 1257, 1263 n.3 (11th Cir. 2006).

When reviewing "challenges to the sufficiency of an indictment, courts give the indictment a common sense construction, and its validity is to be determined by

practical, not technical, considerations." *United States v. Wayerski*, 624 F.3d 1342, 1349 (11th Cir. 2010). A district court is limited to reviewing the face of the indictment and the specific language used to charge the crimes. *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006).

Section B of the Indictment provides the operative charging language of the scheme, alleging (1) the approximate date the conspiracy began; (2) Hernandez's knowing and willful participation in it; (3) that the conspiracy involved the execution and attempt to execute a scheme and artifice to defraud; (4) that the conspiracy sought to obtain money and property by means of false and fraudulent pretenses, representations, and promises; (5) that the scheme intended the transmission of wire communications in interstate and foreign commerce; and (6) that the conduct was in violation of the wire fraud conspiracy statute. Doc. 6 at 2. The Indictment alleged every element of § 1349. The Eleventh Circuit's Pattern Jury Instruction describe the elements as twofold:

> First: Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit bank or wire fraud, as charged in the indictment;
>
> Second: The Defendant knew the unlawful purpose of the plan and willfully joined in it.

A conspiracy charge under § 1349 "does not require the commission of an overt act." *United States v. Gonzalez*, 834 F.3d 1206, 1220 (11th Cir. 2016). Indeed, the Eleventh Circuit's Pattern Jury Instructions for § 1349 sets no requirement for specific, identified conversations. Hernandez's reliance on *Russell v. United States* to argue that

the absence of an alleged statement "is a complete failure to allege an element of the offense," is misleading and erroneous. Doc. 73 at 9 (citing *Russell v. United States*, 369 U.S. 749, 763 (1962)). *Russell* centered on indictments for refusals to answer questions before a congressional subcommittee. "Fraud" or any derivation of the word does not appear in the majority opinion. In reversing the convictions in *Russell*, the Court required that the indictments state the specific questions that the defendant refused to answer because

There is also sufficient factual detail giving notice to Hernandez of the offense. Section C of the Indictment, in particular paragraphs 11 and 12(a)-(m), describe how at least as early as September 2020 he made promises to international drug traffickers of substantial sentence reductions in exchange for substantial fees, while offering services for modalities of cooperation that he knew were not approved yet demanded payments anyway even though the services promised were not rendered. Doc. 6 at ¶¶ 11-12. The Indictment also details the mechanisms for how a defendant could avail himself of a reduction in his sentence, *id*. at ¶¶ 6-10, a process for which Hernandez had real-time familiarity with during the time period of the charged conspiracy because he was cooperating with law enforcement in response to a money laundering case against him in the Southern District of New York.

In short, the indictment alleges a scheme to defraud whereby Hernandez promised substantial sentence reductions in exchange for substantial fees and he did not provide those promised services. *See United States v. Schmitz*, 634 F.3d 1247, 1260 (11th Cir. 2011) (upholding of sufficiency of indictment alleging a defendant

defrauded her employer by performing "virtually no services," generating "virtually no work product" and preparing false statements about the number of hours worked). Materiality, that is, statements having a natural tendency to influence the decision maker, is self-evident in the indictment, too. A promise of a sentence comprising a fraction of what a trafficker was facing—and well below the mandatory minimum—would have an obvious effect on the trafficker's decision to make payments to Hernandez. This is not a case of buyer's remorse among traffickers who expected a lower sentence, but rather a concerted effort to extract payments for services that were not rendered. The indictment and subsequent superseding indictment allege a scheme to defraud based on material misrepresentations that deceived traffickers out of money and property.

Hernandez's Motion inserts an element into the offense where none is required. Indeed, the Indictment would not even merit a bill of particulars, let alone a motion to dismiss. But Hernandez's creation of a rule that specific promises be pled as an element for a § 1349 offense is a distant second to the primary problem in his motion: reliance on a case that is unequivocally bad law. In 2016, the Eleventh Circuit required proof of intent to cause pecuniary harm in wire fraud cases. *See United States v. Takhalov*, 827 F.3d 1307, 1312-13 (11th Cir. 2016) ("a defendant 'schemes to defraud' only if he schemes to deprive someone of something of value by trick, deceit, chicane, or overreaching," but he did not intend to defraud a victim if he did not intend "to obtain by deceptive means, something to which [he] is not entitled"). In *Takhalov*, the Eleventh Circuit joined a handful of other circuits

7

applying such an intent requirement. The Supreme Court, however, resolved a circuit split on the issue in *Kousisis v. United States*, finding that "the wire fraud statute is agnostic about economic loss" and that a violation of the wire fraud statute occurs when a defendant schemes "to obtain the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off." 605 U.S. 114, 124 (2025). So, "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over…money or property—regardless of whether the fraudster, who often provides something in return, seeks to cause the victim net pecuniary loss." *Id.* at 118. In so doing, the Supreme Court expressly abrogated *Takhalov. Id.*

This abrogation of *Takhalov's* holding did not come without warning. Indeed, at least one Eleventh Circuit judge cautioned attorneys and judges alike to "exercise due care in interpreting…*Takhalov* and determining its precedential value" because it was in conflict with extant precent that "fraud about a collateral but still material matter that persuades a victim to enter a transaction he would have otherwise avoided" is "actionable fraud." *See United States v. Feldman*, 931 F.3d 1245, 1265, 1270 (11th Cir. 2019) (W. Pryor, J., concurring). But even though *Takhalov* was the law at the time of Hernandez's alleged misconduct, it does not govern this case.

*Kousisis* has retroactive application in this case. Though "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language" may be akin to an ex post facto law, it is not the case here. *See Bouie v. City of Columbia*, 378 U.S. 347, 352-53 (1964). When a court "clarifies but does not alter the meaning of a

criminal statute," ex post factor considerations are not implicated. *Thompson v. Nagle*, 118 F.3d 1442, 1449 (11th Cir. 1997). That is what the Supreme Court did in *Kousisis*. The Court did not lend judicial expansion to narrow and precise language in the wire fraud statute or depart from its own precedent, but rather clarified the decisional law of wire fraud "when the defendant did not seek to cause the victim net pecuniary loss." *Kousisis*, 605 U.S. at 120. Hernandez's reliance on *Takhalov* to maintain that the indictment did not plead an essential element is erroneous.

The indictment alleges a wire fraud conspiracy and describes a scheme to defraud based on material misrepresentations resulting in payments for services that were not provided. It describes the elements of a wire fraud conspiracy and enables Hernandez to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense. It gives specific factual details that Hernandez knew certain kinds of cooperation were not approved yet continued to demand payments for services he did not provide, among other allegations. A practical and common-sense construction is that the indictment is valid.

## II.   There is No Sixth Amendment Protection for Hernandez's Conduct

There is no categorical exemption that the Sixth Amendment protects deceiving a defendant about legal representation or the remittance of legal fees in all circumstances. Hernandez takes the limited exception recognized in *United States v. Velez* and paints in broad strokes that it applies without limitation to his prosecution. Not so. *Velez* is a narrow holding on a narrow subsection of a narrow statute:

monetary—not financial—transactions exceeding $10,000 for legal fees that are derived from the proceeds of a specified unlawful activity. "The plain meaning of the exception ser forth in § 1957(f)(1), *when considered in its context*, is that transactions involving criminally derived proceeds are exempt from the prohibitions of § 1957(a) when they are for the purpose of securing legal representation to which an accused is entitled under the Sixth Amendment." *United States v. Velez*, 586 F.3d 875, 877 (11th Cir. 2009). There is no principle of statutory construction—let alone any legal principle—that a criminal statutory provision applies to other statutes on different issues absent an indication that Congress intended such a result.

But even if there was a nexus to a Sixth Amendment interest here, it would rest with the defendants who made payments based on Hernandez's representations—not Hernandez—and those defendants are now cooperators who disclosed their communications with Hernandez and the deceptions he uttered. Sixth Amendment rights are personal to the accused, not someone alleged to be using a paralegal certification to try and paper over his conduct. *See Barrows v. Jackson*, 346 U.S. 249, 255 (1953) ("Ordinarily, one may not claim standing in [a subsequent prosecution] to vindicate the constitutional rights of some third party").

Indeed, the communications between Hernandez, traffickers, and their families corroborate that Hernandez was making representations separate and apart from the traffickers' legal teams. Below are a few examples.

<u>Cooperator 1</u>

Cooperator 1 was prosecuted and sentenced in the Middle District of Florida. Anticipated testimony is that Hernandez promised a sentence of no more than four years that could be spent outside of prison in exchange for about $1 million. He highlighted his connections to federal law enforcement, too. Hernandez visited Cooperator 1 at the Pinellas County Jail with the investigator from Cooperator 1's legal team, but Cooperator 1's attorney confirmed that Hernandez was not part of the legal team.

Recorded calls and text messages to Cooperator 1 and a family member, Individual 1, corroborate Hernandez's shifting statements to the family about his role, his law enforcement connections, and the sentence Cooperator 1 would get. For example, in WhatsApp chats with Individual 1 that are translated from Spanish to English, Hernandez represented:

| From | Content |
| --- | --- |
| **April 27, 2021** | |
| HERNANDEZ | "But you need to understand, (Individual 1), it bothers me 😡 that you believe I'm not the DEA." |
| HERNANDEZ | (After referring to Cooperator 2) "Not [Cooperator 1]. He has three years ahead. He'll get out after nine months more or less here to the street…[Cooperator 2] has eight years maximum ahead." |
| **June 17-18, 2021** | |
| HERNANDEZ | "…I want to make it clear to you that I'm sorry now for having taken [Cooperator 1's] case. All I wanted to do was help you all and serve you. I withdrew from the case on January 15. He knows, I have it in writing and I have witnesses, when he didn't turn himself in, I told him to continue with (Cooperator 1's legal team). The truth is that he has the best attorney in the US |

| | |
|---|---|
| | and a good investigator. Tell him to quit saying that he paid me a million dollars that he didn't pay, that he has the telephone there, that he should write to me. |
| Individual 1 | "…you always assumed that you were on [Cooperator 1's] defense and furthermore you yourself were the one who called us to tell us how the situation was, and I understand that you were the one who received the 700 thousand dollars, that's why I called you, since as a family we want to know what is his legal situation…You also indicated that you were the one to contact and repeatedly stated that there was no problem at all" |
| HERNANDEZ | "700 thousand dollars." <br><br> "Are you sure of that?" <br><br> "Did your brother give you that amount?" <br><br> "Where does your brother have that account?" <br><br> "If your brother gave you that amount either he's dishonest or he's a person who is not well?" |
| Individual 1 | "You hadn't told me that, but in any case I'll make contact with the gentlemen (Cooperator 1's legal team). Up until a few days ago you were telling me that you were still on the case." <br><br> "…I still wonder why when we talked a few days ago you were still on his case, but in the end only God knows why." <br><br> "You always told me that a service had been paid for and as a family we want to know what has been accomplished. It's nothing more than that." |
| HERNANDEZ | "I'm still on the case. I'm a serious person and keep my word. I'm not an unstable person like your brother, I'm not a liar nor a big talker. Your brother made us look bad here in Tampa." <br><br> "I'm not delirious. I'm a man who has characterized himself by being temperate. I don't consume marijuana, much less cocaine. I'm seated between five agents right now who are also reading this. I'm just clearing up all the points of the issue of [Cooperator 1]. Since I withdrew from the case in January, I told him to continue with [Cooperator 1's defense investigator]…." |

| | "Think whatever you like." |
|---|---|
| | I'm not concerned at all about what you think" |

| **April 25, 2022** | |
|---|---|
| HERNANDEZ | "I'm with the US Government. I help people but I cannot abuse the system…." |

| **March 14-15, 2023** | |
|---|---|
| HERNANDEZ | "Please, talk to [Cooperator 1], that I have neither stolen anything from him nor do I need to steal from anybody." <br><br> "And I separated from the subject of [Cooperator 1], because of so much gossip, and my life here changed." <br><br> "He has his lawyer, his investigator." <br><br> "And the accounts are over there." <br><br> "And I don't want to talk to make the authorities here aware that there are threats, because I speak more than I should. If I do that I'll hurt his case. Please, talk to your brother, and tell him that here are the accounts." |
| Individual 1 | "Good morning. With respect to what you are writing me, I don't understand. <br><br> 1. We have requested the contract for over $700,000, which were delivered, and you were the one who received them through Caruca (Cerchiaro), the individual who you placed as the go-between to receive the cars, cash, and lastly the house that was delivered to Mr. Nego Suarez. <br><br> 2. It is necessary for the contract to specify the functions and value that was paid to each one of those who participated; due to the fact that at initially were talking about the defense for four people and only it is being done for over $700,000 for [Cooperator 1 and a codefendant]. <br><br> 3. Within that negotiation that you proposed, it was said that [Cooperator 1] was going to be in jail for only eight months and the rest on house arrest. <br><br> 4. While [Cooperator 1] was still in Colombia, there is a three-way call between Ricardo, you and him, and during that phone conversation, you are still insisting in the negotiation of the eight months in jail and the rest outside serving his sentence. |

|  | 5. In September 2022 you go to the jail where you inform him that there are $100,000 missing for his defense, and he asks you where he is supposed to be getting that money.

6. Here an adequate amount of money was paid for some services, and nothing out of what you promised has happened.

7. We have started to get familiar with the judicial system there, and it's not how you said it was.

8. When you tell me that over there you can report and say too much to hurt my brother, you do it in a threatening and intimidating way, for which I'm wondering what you have to do in this entire process. What do you want to achieve telling me that? We delivered to you some properties, cars and cash, which is not a lie, for some services that have yet to be fulfilled, as you had promised, several things, including only eight months in jail. What's more, at that time you received it at $3,000 bucks on the dollar.

9. [Defense Attorney] has followed through in what respects to attending the hearings as the lawyer, and we requested the contract from him, same as from [Defense Investigator], and it has yet to happen. But you were the person who received everything.

10. You sent a female lawyer to visit [Cooperator 1] in jail, where he was told about habeas corpus, and that was clear. Any citizen can request it, and it is his or her right to do it. Also any defendant can exercise his or her defense. What's more, we already discussed that subject with [Defense Attorney].

11. By the way, you all had a machine and returned it incomplete. I would appreciate it if you return the missing parts and in optimum conditions."

"I'm waiting for the contract for the delivered value, bound by the functions of each of you. Thank you. |
|---|---|

<u>Cooperator 2</u>

Cooperator 2 was prosecuted and sentenced in the Middle District of Florida. Anticipated testimony is that Hernandez promised a short sentence in exchange for an agreed fee of $700,000.

WhatsApp messages between Hernandez and Cooperator 2's defense attorney discussed third-party cooperation. In one, Hernandez advises the attorney to "Tell Carlos (the DEA agent) that that person (the third-party cooperator) is a native that takes care of boats…He doesn't have any relationship with the (Cooperator 2) family." Counsel responded, "I can only say Agent Carlos Cruz'[s] words: 'We need to identify who will be the person who will install the 'trackers' – to know who that person is, and the relationship of the person with the (Cooperator 2) family – and that person will need to meet with Carlos or his agents, in order to provide the cooperation later on." Third-party cooperation was never approved, yet Hernandez continued to collect money for himself. Counsel confirmed that Hernandez was not part of the legal team for Cooperator 2.

In subsequent recorded jail calls, Hernandez blames the defense attorney for Cooperator 2's sentence, that the FBI protects him, and that Cooperator 2 would get a Rule 35 in four months. To date, there is no Rule 35 for Cooperator 2.

<u>Cooperator 3</u>

Cooperator 3 was prosecuted in the Southern District of Florida. Hernandez approached him with similar representations. Cooperator 3 consented to a recording at the jail while awaiting trial with Hernandez, who was able to gain access as a

paralegal. In that recording, Hernandez discusses providing informants to provide

information for Cooperator 3's benefit.

| Speaker | Content |
|---|---|
| | Excerpt 1 |
| Cooperator 3 | Cuz, and what are we going to do? You know that the, the lawyer, he says that information from third parties doesn't work for me. That th-that shit doesn't work for me, so how can we do it so that the shit can be through me, I mean, for it to be directly through me and not with them. |
| HERNANDEZ | We start off by taking the money [U/I] I don't sell positivos[4] to anyone. I am going to help you with the informers' info, do you understand? |
| Cooperator 3 | I see. |
| HERNANDEZ | I'll take care of those expenses. And I made a commitment…I made a commitment to you and I made a commitment to your wife that I had to help you, so, I know you don't have cash. I mean, thank God I'm well off financially, spending 1,200 million pesos, 200 million in one— |
| Cooperator 3 | No, but I can, I mean, I can pay some money for expenses, do you understand? For the guys… |
| HERNANDEZ | [U/I] the informers, I handle them directly, I'll put them for him, so that they put the spot on the [U/I]. Done. |
| Cooperator 3 | But, so, I mean, yeah, but you know that it can't b-they—he tells me that it can't be from a third party, that the thing has to be directly from me. |
| HERNANDEZ | But, but how, how can that be directly if you're not there? |
| Cooperator 3 | No, I mean, that, that supposedly the person has to be mine directly. |
| HERNANDEZ | Yes, but that's why, I'll get you to talk with the person directly; you call him, you find a way to call him from here…[U/I] give you your private investigator. He needs to travel and meet with them, and introduce him to the agents in Cartagena or with the United States…there's prosecutors that accept |

[4] A "positivo" in the vernacular of cooperation in drug investigations is the sale of information leading to a seizure of drugs.

| | |
|---|---|
| | collaboration from third parties, but it's better if it comes from your informers directly, like, when I worked in Tampa those were my informers; I was sitting at a desk and I blew up the big ones at least, I blew up the big ones because I had an informer right next to him, I got three informers on one, and I, and I, and I caught them four boats and six from [U/I] |
| Cooperator 3 | I see, I see, I see |
| HERNANDEZ | You understand now? But I wasn't in prison. I could [U/I] 276 informers; what I can do is put two or three informers to produce for you and it'll be through your private investigator. |

|  Excerpt 2 ||
|---|---|
| HERNANDEZ | How long is he telling you? |
| Cooperator 3 | Oh, they're offering me some, some time, you understand? |
| HERNANDEZ | How long? |
| Cooperator 3 | But I mean tough in the sense of what was done with—what you told me about what you did with Yuri, is that possible? I mean, get me out and let—I'll fix my problem out in the street. |
| HERNANDEZ | Yeah, it's possible. |
| Cooperator 3 | Is that possible? |
| HERNANDEZ | Of course, that that that can be done by the lawyer, but the thing is that Yuri did, did a lot [of time]. Ruben Rodriguez did a lot, too. Ruben Rodriguez, um, lasted three months and they let him…but they put a bracelet on him. |
| Cooperator 3 | But now, now, is that possible or that can't be done? (Non-pertinent Conversation) But they're telling me 18. |
| HERNANDEZ | 18 years? |
| Cooperator 3 | And that's quite some years, cuz. |
| HERNANDEZ | How many have you done already? |
| Cooperator 3 | It's been three. |

| | |
|---|---|
| HERNANDEZ | …That's about four, that's 14, if they give you [U/I] 35, seven, and he writes a…he can write a good letter of recommendation and you get in paying 4 and we get on it to, to, to work with them, but that's why it would, it would've been good for the lawyer to be here. |

| Excerpt 3 | |
|---|---|
| Cooperator 3 | The thing is that the lawyer he – the lawyer, I mean, I don't know, the lawyer tells me, "Hey, no information coming from a third party will work out for you." So, we have to handle—you take a good look into the situation, how we're going to do it so you can help me and these people don't realize that I'm doing that with third parties, do you understand? That's why I didn't want him listening to what we were talking about. (**Note:** Defense attorney, aware of what was going on in advance, did not participate in this meeting) |
| HERNANDEZ | But look, here in this country, here in this country things have to get done, everything on the table [U/I], why? Because you get in to-uh, you end up getting into a bigger problem, and I'll end up getting into another. We all have to do it through your lawyers and your investigator. That's what the investigator is for, to say, "There are some informers of [Cooperator 3] here; I'm going to introduce them to you." "When?" "Well, I don't know, let's do a meeting in Cartagena." They go, they're from your area, some of them that he mentioned, relatives of yours. Do you understand? |

| Excerpt 4 | |
|---|---|
| HERNANDEZ | Alright. So, so, for me to cover you, for you to cover me, that's what (the defense investigator is) there for. I'm going to tell him before I leave. So, there are some that are your cousins, I mean, that there's no need to say that…because what the DEA could think is, "Oh no, these guys are buying positivos." We're not going to buy positivos. They keep the informers, then they exploit the informers. How much do you think they pay a "pen a un" (slang for mope) of those guys. Four or five million pesos. How much is the DEA going to pay for each, for each speedboat? Between 25 and 50 thousand dollars? What side will they take? |
| Cooperator 3 | Of course. |
| HERNANDEZ | Do you understand me now? |
| Cooperator 3 | Automatically, automatically. |

| Excerpt 5 | |
|---|---|
| HERNANDEZ | (After Cooperator 3 brought up someone who got a lengthy sentence) How |

| | |
|---|---|
| | many? |
| Cooperator 3 | I think it was 13 or 14. |
| HERNANDEZ | That's not going to happen with you. Don't even be scared about the 18. I have a friend who got 35, and do you know how many he did? Four…. |

| | |
|---|---|
| Excerpt 6 | |
| HERNANDEZ | But, but the lawyer can request for you to do ca- he can say you want to work, so you can make calls, and he can get you the numbers of all the informers and the names, and you can call them directly and give them the address, give them the address [U/I]. First thing you need to do is meet with the agents. That will give you points already. |
| Cooperator 3 | Oh, what if they ask me how I met the informers? |
| HERNANDEZ | But you know them. |
| Cooperator 3 | I know them? |
| HERNANDEZ | Yes, of course. You know them. |
| Cooperator 3 | Shit, this sucks. |

| | |
|---|---|
| Excerpt 7 | |
| Cooperator 3 | The idea is that, the idea is that these peo- I mean, they can't reali- they can't find out, you understand? |
| HERNANDEZ | No, I mean they, things have to be done with transparency, in the face of the law, in the face of the officers, the officers, why? Because it's relatives of yours to whom you don't have access, [U/I] happened. What I'm going to do is an introduction, do you understand? |
| Cooperator 3 | Let's move forward, Boli, help me out with that. |
| HERNANDEZ | We have to introduce them to your relatives, and they need to meet with them. They can travel to Barranquilla or Cartagena, and they go there. And they can ask for a legal call that day, and put them through to you on the phone. |

The examples above are all illustrative of Hernandez working outside the ambit of legal teams, making representations about prison sentences or describing deceptive methods of cooperation for his personal benefit. Recognizing and keeping sacrosanct "t[]he ability of defense teams to engage in candid discussions with clients regarding cooperation, sentencing possibilities, and strategic options" is not diminished when a rogue operator deceives others to make money on the side for him and his associates. Doc. 73 at 16. The motion to dismiss should be denied.

## CONCLUSION

The indictment conforms with the pleading requirements of a wire fraud conspiracy and does not criminalize core defense activity. The motion should be denied.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By:  /s/ *Daniel Baeza*
DANIEL BAEZA
Assistant United States Attorney
USAO No. 164
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Daniel.Baeza@usdoj.gov

**U.S. v. Hernandez Villazon**          **Case No. 8:25-cr-327-WFJ-AAS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 9, 2026, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system, which will send a notice of

electronic filing to the following:

Defense Counsel of Record

/s/ *Daniel Baeza*
DANIEL BAEZA
Assistant United States Attorney
USAO No. 164
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Daniel.Baeza@usdoj.gov