UNITED STATES DISTRICT COURT
MIDDLE  DISTRICT OF FLORIDA

CASE NO. 25-00327-WFJ

UNITED STATES OF AMERICA

v.

JORGE LUIS HERNANDEZ VILLAZON,

Defendant.

_____/

### DEFENDANT'S MOTION TO SUPPRESS FDC RECORDED CONVERSATION AND REQUEST FOR EVIDENTIARY HEARING

The defendant, Jorge Luis Hernandez Villazon, through undersigned counsel, respectfully moves to suppress the covertly recorded conversation obtained at the Federal Detention Center in Miami, together with all derivative evidence and testimony arising therefrom.[1]    Mr. Hernandez further requests an evidentiary hearing.

## I.  INTRODUCTION

This prosecution began with a government engineered operation directed at Mr. Hernandez while he was represented by counsel, actively cooperating with federal authorities and awaiting sentencing in the Southern District of New York. On February 29, 2024, federal agents orchestrated and secretly recorded a meeting between Mr. Hernandez and an incarcerated cooperating defendant inside the Federal

_____

[1]/ By filing this Motion to Suppress, Mr. Hernandez does not waive any defenses or arguments raised in his pending Motion to Dismiss the Indictment [ECF No. 73], Motion for Bill of Particulars [ECF No. 75], and Notice of Public Authority Defense [ECF No. 76].

Detention Center ("FDC"). The encounter was arranged through the cooperating defendant and his attorney, conducted in a government controlled setting, and used to generate the evidence that now forms the foundation of this case.

The government did not simply uncover an existing criminal scheme. It created the encounter from which the prosecution now flows. The recording preceded the witness interviews, investigative steps and evidence upon which the Superseding Indictment is based.

At the time of the operation, Mr. Hernandez occupied a uniquely sensitive position. He was a represented defendant in a pending federal case, a documented federal source assisting with a significant corruption investigation involving federal agents and criminal defense attorneys and a paralegal working on criminal defense teams in Florida. The government was aware of these overlapping roles. Yet while one arm of the Department of Justice continued to rely on and later praise his cooperation at sentencing, another targeted him through a covert operation designed to elicit statements outside the presence of counsel.[2]

The Constitution permits the government to investigate crime. It does not permit the government to manufacture the very encounter that creates the evidence

---

[2] A copy of the Sentencing Memorandum filed by the government in the Southern District of New York is attached as Exhibit "A." *See United States v. Hernandez,* Case No. 21 Cr. 00011 (JPO) (SDNY.). Filed on May 17, 2024, approximately three months after the covert FDC operation at issue here and just two weeks before Mr. Hernandez's sentencing, the Memorandum confirms Mr. Hernandez's nearly two decades of cooperation with federal law enforcement, including his role as a documented federal source and his more recent undercover work.

on which a prosecution is built. Because the recording was obtained through government conduct that violated fundamental principles of due process, targeted a represented defendant, constituted outrageous government misconduct and raises substantial entrapment concerns, all recordings, statements, and derivative evidence must be suppressed.

At a minimum, Mr. Hernandez requests an evidentiary hearing to determine the full extent of the government's involvement in planning, directing, and executing the operation that launched this prosecution.[3]

## II.  FACTUAL BACKGROUND

### A.    Mr. Hernandez's Longstanding Relationship With Federal Authorities

For more than two decades, Mr. Hernandez worked with federal law enforcement authorities as a confidential source and cooperating witness in multiple jurisdictions. *See* Exhibit A. During that period, he provided information and assistance to several federal agencies, including the Federal Bureau of Investigation

---

[3]/ Because the government seeks to introduce evidence obtained through this covert operation, it bears the burden of demonstrating that the recording was lawfully obtained. Yet the government has identified no legal authority authorizing the placement of a covert recording device inside an attorney-client meeting room at FDC, no approval process governing the operation and no factual basis supporting its use. Although Mr. Hernandez specifically requested the documents reflecting the legal authorization, the government has refused to produce them. Without such evidence, the Court cannot determine whether the recording was constitutionally obtained or whether the government's conduct complied with the Sixth Amendment, the Due Process Clause, or applicable legal requirements. Absent such a showing, suppression is warranted. At a minimum, the government's refusal to disclose the basis for this extraordinary investigative technique further demonstrates the need for an evidentiary hearing.

("FBI"), the Drug Enforcement Administration ("DEA"), and Homeland Security Investigations ("HSI").

Beginning in approximately 2018, Mr. Hernandez became the target of a money laundering investigation out of the Southern District of New York. After being approached by FBI, Mr. Hernandez immediately retained counsel, accepted responsibility for his conduct and began cooperating with federal authorities. He ultimately entered a guilty plea and continued to provide substantial assistance to the government over the course of several years. *See United States v. Hernandez, supra.* That cooperation extended far beyond routine debriefings. Mr. Hernandez maintained ongoing communications with federal agents and prosecutors, developed and managed source networks, participated in undercover operations and provided substantial assistance in highly sensitive corruption federal investigations and prosecutions. *See* Exhibit A.

Among other matters, Mr. Hernandez ultimately served as a principal government witness in the prosecution of two former, long–term DEA agents from Miami. *See United States v. John Constanzo and Manuel Recio,* Case No. 22 Cr. 281 (JPO) (SDNY). Over the course of two days, Mr. Hernandez testified in open court regarding his undercover interactions with the corrupt DEA agents and authenticated multiple recordings obtained at the direction of the FBI. On November 8, 2023, both DEA agents were convicted on multiple corruption and money laundering counts and they were sentenced on April 24, 2024 (Constanzo) and May 14, 2024 (Recio). Mr. Hernandez also provided assistance in other federal investigations in the SDNY and

the District of Puerto Rico.[4]  *See* Exhibit A.

Mr. Hernandez's relationship with federal authorities was longstanding, documented and ongoing during the time period charged in the Superseding Indictment,.

### B.    Mr. Hernandez's Simultaneous Work With Criminal Defense Teams

At the same time that he was cooperating with federal authorities, Mr. Hernandez worked as a paralegal with criminal defense teams representing individuals facing extradition and prosecution in the United States.  His work included communicating with clients and their families, gathering information relevant to criminal defense strategies, assisting attorneys in evaluating cooperation opportunities, facilitating communications concerning sentencing mitigation and working with defense teams seeking favorable outcomes for their clients.[5]

Federal authorities in the SDNY were fully aware of this work. Agents and prosecutors supervising Mr. Hernandez's cooperation knew that he was associated with criminal defense teams and that he regularly communicated with individuals facing federal prosecution. Federal authorities also possessed contemporaneous visibility into his financial activity and communications through their ongoing supervision of his

---

[4]/ The SDNY prosecutors were also investigating several criminal defense attorneys that worked with the convicted DEA agents. Mr. Hernandez was also a potential witness in those investigations and indicted cases.

[5]/ It is anticipated that Mr. Hernandez's FBI informant file contains confirmation of the government's visibility of his actions during this time. *See* Brady Review Order, ECF No. 115.

cooperation activities.

Accordingly, during the period relevant to this motion, Mr. Hernandez occupied a unique position. He was simultaneously an active federal cooperator, a member of criminal defense teams representing individuals facing federal prosecution, and a represented defendant awaiting sentencing in the SDNY. The government was aware and consented to Mr. Hernandez overlapping roles.

### C.    The Government Initiates its Investigation Through a Covert Operation in a Miami Federal Detention Center Attorney Room

While Mr. Hernandez remained an active cooperator and three months before he was sentenced in the SDNY, federal agents[6] initiated the investigation underlying this case through a covert operation conducted at the FDC Miami. Specifically, the covert operation took place in an attorney-client legal visiting room on the first floor of FDC.

In or around early 2024, FDC inmate, Edwin Samuel Duran Colina ("Duran"),[7] a Colombian national, and his family, contacted Mr. Hernandez to request a meeting at FDC. Subsequently, Duran's attorney, at that time, contacted Mr. Hernandez to arrange the meeting. Mr. Hernandez provided the necessary paralegal credentials to Duran's legal defense team to gain admission to FDC and shortly thereafter Duran's

---

[6]/ Based on the recording, it appears that DEA was the primary agency conducting the covert operation at FDC.

[7]/ *United States v. Edwin Samuel Duran Colina*, Case No. 21-cr-20142-RNS (SDFL). Duran was extradited from Colombia in May 2023, to face drug trafficking charges dating back to 2018 through 2021. *See* Duran Indictment.

defense investigator contacted him to schedule the meeting.

On February 29, 2024, Duran's defense investigator met Mr. Hernandez at FDC to escort him to visit with their client.  Unbeknownst to Mr. Hernandez, federal agents utilized Duran to establish contact with Mr. Hernandez and arrange a meeting inside FDC.  The government selected the location of the meeting, controlled the circumstances under which it would occur, installed recording equipment, monitored the encounter and secretly recorded the resulting conversation.

The government's selection of Mr. Hernandez as the target of this operation cannot be separated from his role as a member of criminal defense teams. Agents knew that incarcerated defendants and their families routinely communicated with Mr. Hernandez concerning legal matters, cooperation issues and sentencing matters. Agents further understood that a request originating from an incarcerated individual and facilitated through his attorney  would carry a degree of credibility and trust not present in an ordinary undercover operation.

The government therefore utilized the very relationships that arose from Mr. Hernandez's role in criminal defense matters to create the circumstances necessary for the recording to occur.  Unlike a traditional undercover investigation in which law enforcement infiltrates or observes ongoing criminal conduct, the government here created the encounter itself. The participants, timing, location and recording environment were all selected and controlled by the government.

D.     The FDC  Recording Was the Catalyst for the Investigation

At the time agents orchestrated the FDC operation, the government had not yet

conducted the interviews of Mr. Hernandez's former clients and cooperating witnesses that now form a substantial portion of its prosecution theory. Those interviews occurred only after Mr. Hernandez's sentencing in the SDNY on May 31, 2024, over three months after the FDC recording had already been secured. *See* Government Complaint [ECF No. 1 at ¶7].

The chronology is significant. Before arranging the FDC encounter, the government had not obtained any evidence that Mr. Hernandez had proposed or participated in the use of undisclosed third-party cooperators or made false promises of sentence reductions to clients of the criminal defense teams with whom he worked. Nor had it obtained any recorded communications or witness testimony suggesting the existence of such a scheme.

Instead, agents enlisted Duran, an incarcerated cooperating defendant and his attorney, to arrange and participate in a covertly recorded meeting with Mr. Hernandez. As the recording itself reflects, Duran, not Mr. Hernandez, first introduced the subject of secretly utilizing third-party cooperators. Duran repeatedly returned to the topic, and each time Mr. Hernandez rejected the proposal and declined to participate.

Only after that government engineered encounter did agents begin developing the witness testimony that now forms a substantial part of the prosecution. The sequence of events is therefore critical. It bears directly on whether the government uncovered an existing criminal scheme or instead created the circumstances that gave rise to the investigation. It also goes to the heart of Mr. Hernandez's entrapment and

due process claims.

E.    The Covert Recording

During the approximately 90–minute recorded meeting, Duran repeatedly attempted to steer the conversation toward the secret use of third–party cooperators to obtain a potential sentencing reduction. On at least six separate occasions, Duran returned to the subject. Each time, Mr. Hernandez either rejected the proposal, redirected the conversation, or otherwise expressed no willingness to participate in the suggested conduct.

At one point, Mr. Hernandez affirmatively explained that any cooperation had to be coordinated through his legal team. Specifically,[8]

| SPEAKER | SPANISH | ENGLISH |
|---|---|---|
| Duran | Es que lo que pasa es que el abogado me — el abogado, o sea, no se, el abogado me dice a mi, me dice: "Oiga, ninguna informacion que vengaa de parte de tercero a usted le sirve. Entonce hay que manejar – tu analiza bien la situacion, como lo vamos a hacer para que tu me ayudes y que esta gente no se de cuenta de que yo estoy haciendo eso con terceros. Entiende? Por eso you no quise que el [invesitigador] escuchara lo que estabamos hablando nosotros. | The thing is that the lawyer he – the lawyer, I mean, I don't know, the lawyer tells me, "Hey, no information coming from a third party will work out for you." So, we have to handle – you take a good look into the situation, how we're going to do it so you can help and these people don't realize that I'm doing that with third parties, do you understand? That's why I didn't want him [the investigator] listening to what we were talking about. |

---

[8]/ The following excerpt is taken from the transcript produced by the government. Mr. Hernandez, however, objects to the transcript in its current form because it contains numerous errors in both the Spanish transcription and the English translation. If the parties are unable to resolve those deficiencies, Mr. Hernandez will seek appropriate relief by separate motion.

| Hernandez | Pero mira, aqui en este pais, aqui en este pais hay que hacer las cosas, todo sobre la mesaa [I/I], por que? Porque te metes en un pro-eh, terminas tu metiendote en un problema mas grande y termino yo mentiendome en otro. Todos tenemos que hacerlo por intermedio de tus abogados y tu investigador, | But look, here in this country, here in this country things have to get done, everything on the table [U/I], why? Because you get into tro-uh, you end up getting into a bigger problem, and I'll end up getting into another.  We have to do it through your lawyers and your investigator. |

Even more significant is Duran's repeated effort to persuade Mr. Hernandez to sell third-party cooperation. Rather than embracing the proposal, Mr. Hernandez unequivocally rejected it each time, stating: **"Yo no vendo positivos a nadie."** ("I don't sell positives [cooperation] to anyone.")(emphasis added).

Far from evidencing a willingness to engage in criminal conduct, the recording captures Mr. Hernandez repeatedly refusing the very proposal that the government's cooperating defendant continued to advance.

### III. LEGAL ARGUMENT

#### A.   The Government May not Create Basis for Prosecution

The Supreme Court has long recognized that the government "may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so the government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548-49 (1992). Likewise, due process imposes limits upon law enforcement conduct when the government itself becomes the driving force behind the criminal activity or evidence it later seeks to prosecute. *United States v. Russell*, 411 U.S. 423, 431-32 (1973).

That concern is present here. This investigation began with a government engineered encounter. Agents did not uncover evidence of criminal conduct. They initiated contact, arranged the setting and generated the statements they now rely upon. Under *Jacobson,* this government manufactured scenario is prohibited and the Eleventh Circuit has confirmed this conclusion. Where the government instigates the activity, provides the means, and controls the operation, due process concerns are implicated. *United States v. Brown*, 43 F.3d 618, 623–625 (11th Cir. 1995)(adopting *Jacobson* and finding that "a some point it becomes impossible to separate a defendant's independent readiness and willingness from the mental state created by the government"). That is precisely what occurred here.

The timing of the government's conduct is critical. At the time the operation was conducted, the government had not yet obtained the later statements from former clients and cooperating witnesses that now form a substantial part of the prosecution's theory. Those interviews occurred months later, after Mr. Hernandez had been sentenced in the SDNY. The FDC recording therefore did not arise from an already existing investigation. Rather, the recording served as the catalyst for the investigation itself.

More importantly, at the time of the encounter, Mr. Hernandez was actively cooperating with federal authorities in the SDNY and Puerto Rico, including investigations involving corrupt attorneys and had not yet been sentenced. His liberty interests were directly tied to his cooperation. Initiating a covert recording operation against a cooperating defendant in this posture violates basic notions of fairness. *See*

-11-

*United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007)("outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees").

### B.    The Government Deliberately Circumvented an Active Attorney-Client Relationship

The method used to initiate the encounter independently violates the Sixth Amendment. The Sixth Amendment prohibits the government from deliberately eliciting statements from a represented defendant through its agents or intermediaries. *Massiah v. United States*, 377 U.S. 201, 206 (1964); *Maine v. Moulton*, 474 U.S. 159, 176 (1985). As the Eleventh Circuit held in *United States v. Noriega*, 917 F.2d 1543, 1551 (11th Cir. 1990), government intrusion into attorney related channels requires heightened scrutiny.

Here, the government utilized a cooperating defendant's attorney to contact Mr. Hernandez and arrange the meeting. This was not passive monitoring. It was deliberate elicitation through an intermediary invoking a channel associated with legal representation. The Supreme Court has made clear that the government may not deliberately elicit statements from a represented defendant through such means. *Massiah*, 377 U.S. a 206; *Moulton*, 474 U.S. at 176. As recognized in *Noriega*, intrusion into the attorney-client relationship implicates core Sixth Amendment protections. 917 F.2d at 1551.

The involvement of counsel is particularly troubling. The government deliberately weaponized a legal access channel so that Mr., Hernandez had no reason

to distrust the contact.  The government's selection of Mr. Hernandez as the target of the FDC operation cannot be divorced from his role within criminal defense teams. Agents knew that incarcerated defendants and their families routinely communicated with Mr. Hernandez in connection with legal matters, cooperation efforts, and sentencing issues. The government therefore understood that an approach originating from an incarcerated individual and facilitated through counsel would carry a degree of credibility and trust unlikely to exist in an ordinary undercover operation.

By exploiting those preexisting professional relationships, the government was able to create a conversation that otherwise would not have occurred. The FDC recording was therefore not the product of passive observation. It was the product of a government engineered encounter that depended upon Mr. Hernandez's dual status as both a federal cooperator and a member of criminal defense teams.

Whatever label the government places upon this operation, its practical effect was the same. Federal agents utilized a cooperating defendant and the defendant's attorney to create circumstances designed to obtain statements from a represented individual outside the presence and protection of counsel. The attorney-client relationship is intended to function as a safeguard between the accused and the immense power of the government. The operation at issue bypassed that protection entirely.

### C.    The Government's Conduct Violated Due Process and <u>Requires Suppression of the Recording</u>

The Due Process Clause imposes constitutional limits on the methods by which the government may investigate and prosecute criminal cases. In *Russell*, the Supreme

Court recognized that law enforcement conduct may become "so outrageous" that due process principles bar the government from invoking judicial process to obtain a conviction. 411 U.S. at 431-32. Although the doctrine is reserved for extraordinary cases, it remains a viable constitutional limitation on governmental power. Id. at 434–435 ("The function of law enforcement is the prevention of crime and the apprehension of criminals . . . . that function does not include the manufacturing of crime.").

The Eleventh Circuit recently reaffirmed the doctrine in *United States v. Flintroy*, recognizing that a defendant may obtain relief where law enforcement techniques become so fundamentally unfair and shocking to the universal sense of justice that due process requires judicial intervention. 2025 U.S. App. LEXIS 25337 (11th Cir. 2025). *Flintroy* confirms that the inquiry focuses on the totality of the circumstances, the tactics used to obtain evidence, whether the alleged misconduct relates directly to the charged conduct and whether the challenged evidence is the product of the government's conduct.

This case is materially different from the ordinary undercover investigation. Mr. Hernandez does not challenge the government's general ability to use an incarcerated cooperating defendant, conduct undercover operations, or create an opportunity to commit a crime. He challenges something far more troubling – a government engineered operation in an attorney-client protected room inside a federal detention center designed to generate evidence that otherwise did not exist. See Russell, 411 U.S. at 435 (Congress could not have intended criminal punishment for a defendant

-14-

who was induced to commit the offense by the government).

At the time of the operation, Mr. Hernandez was not a stranger to federal law enforcement. He was a documented federal source who had cooperated with authorities for over two decades, provided assistance in multiple investigations, testified in significant federal prosecutions and was awaiting sentencing in the SDNY. Federal authorities knew his status, his history of cooperation and his ongoing relationship with the government. Against that backdrop, agents orchestrated an unprecedented operation inside a federal detention facility. An incarcerated cooperating defendant was used to bring Mr. Hernandez to FDC. The cooperator's attorney participated in arranging and facilitating the meeting. The government secretly wired the location and recorded the conversation for the purpose of eliciting statements from Mr. Hernandez outside the presence of counsel.

This was not observation of ongoing criminal conduct. It was the deliberate creation of an artificial custodial setting designed to implant a criminal design in the mind of Mr. Hernandez and generate evidence. The challenged recording is not merely connected to the alleged misconduct, it is the direct product of it. The distinction is critical. In the ordinary undercover case, law enforcement infiltrates or observes criminal activity already underway. Here, the government created the encounter and then built the investigation around the statements it obtained. The government manufactured the setting necessary to produce the evidence.

The Court should consider the operation as a whole. *See United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir. 1984)(whether outrageous government

conduct exists turns upon the totality of circumstances with no single factor controlling). Viewed collectively, the government targeted a represented defendant who had spent years assisting federal authorities, utilized an incarcerated cooperator with whom Mr. Hernandez had an existing relationship, employed the cooperator's attorney to facilitate the encounter, selected a federal detention facility as the venue, secretly wired the location, and intentionally created a custodial setting designed to elicit statements. The cumulative effect crosses the line separating legitimate investigation from fundamentally unfair evidence manufacturing.

The facts here present a unique an unprecedented scenario that underscore the extraordinary nature of this case. Neither *Flintroy* nor any reported Eleventh Circuit decision involved a secretly recorded detention-center encounter arranged through an incarcerated cooperator and his attorney for the purpose of eliciting statements from a represented defendant who was simultaneously serving as a federal source and cooperator. The absence of precedent approving such conduct is not a reason to deny relief; it confirms how far outside traditional investigative practices this operation falls.

The Due Process Clause exists to address the rare case in which governmental conduct exceeds constitutional limits. This is such a case. The Court should suppress the recording, all derivative evidence, and any testimony concerning the encounter. At a minimum, the Court should conduct an evidentiary hearing to determine the full extent of the government's involvement in planning, approving, directing, and executing the operation.

## IV.  <u>REQUEST FOR EVIDENTIARY HEARING</u>

Mr. Hernandez respectfully requests an evidentiary hearing. The facts presently known establish a substantial basis for relief and raise numerous unresolved questions concerning the planning, authorization, and execution of the covert FDC operation that generated the recording at issue.

## V.  <u>CONCLUSION</u>

This prosecution rests upon evidence generated through a government engineered operation. Federal agents targeted a represented defendant who was actively cooperating with the United States, utilized an incarcerated cooperator and the his attorney to initiate the contact, secretly recorded the resulting conversation inside the FDC attorney-client meeting room and then, used that recording to launch the investigation that followed.

Viewed in its totality, the government's conduct exceeded the bounds of permissible law enforcement activity and resulted in the creation of evidence that would not otherwise have existed. Accordingly, Mr. Hernandez respectfully requests that this Court suppress the February 29, 2024, recording together with all derivative evidence and testimony arising therefrom.

Respectfully submitted,

**PIÑERA-VAZQUEZ LAW FIRM**
901 Ponce De Leon Blvd
Suite 400
Coral Gables, Fl. 33134
T.  305.443.0629
E.  sbp@pineravazquezlaw.com

  /s/ Silvia B. Piñera-Vazquez
Silvia B. Piñera-Vazquez

-17-

## Local Rule 3.01(g) Certification

Undersigned counsel has conferred with Assistant United States Attorney Daniel Baez regarding this motion to suppress and he conveyed that the government opposes the motion.

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that on June 30, 2026, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.

    /s/ Silvia B. Piñera-Vazquez
Silvia B. Piñera-Vazquez, Esq.