**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 17, 2024

**TO BE FILED UNDER SEAL**

**BY EMAIL**

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

> **Re:** ***United States v. Jorge Luis Hernandez Villazon*, 21 Cr. 11 (JPO)**

Dear Judge Oetken:

The Government respectfully submits this letter in connection with the sentencing of the defendant, Jorge Luis Hernandez Villazon ("Hernandez"), which is scheduled for May 31, 2024.

**Preliminary Statement**

On January 5, 2021, Hernandez pled guilty to a one-count Information 21 Cr. 11 (JSR) (the "Information"), which charged him with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). Hernandez entered his guilty plea pursuant to a cooperation agreement with the Government. Under that agreement, if Hernandez provides substantial assistance in the investigation and prosecution of others, and otherwise complies with the obligations imposed by the agreement, the Government will request that the Court sentence him in light of the factors set forth in Section 5K1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines").

The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Hernandez has rendered in the investigation and prosecution of others. In light of these facts, and assuming that Hernandez continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Guidelines and Title 18, United States Code, Section 3553(e), that the Court sentence Hernandez in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

## Factual Background

### A. Offense Conduct

In 2018, the FBI began investigating an unusual pattern of payments that were being wired from overseas bank accounts into business accounts owned by Bruce Bagley, a University of Miami professor. The payments typically amounted to between $200,000 and $350,000, for a total of approximately $2.5 million in a roughly ten-month period. The payor was an account in the United Arab Emirates held in the name of an alleged food company. After the money was transferred into his business accounts, Bagley would draw cashier's checks for approximately 90 percent of the funds payable to a company owned by Hernandez, and Bagley would transfer the remaining ten percent of the money into a personal account he owned. In other words, Bagley was being paid ten percent to operate a funnel account through which large volumes of money were entering the United States and being transferred to Hernandez. In October 2018, Bagley's bank closed his account due to the suspicious activity.

On October 28, 2018, the FBI approached Hernandez regarding the payments flowing through Bagley's account. Hernandez acknowledged that the funds were corruption proceeds belonging to Alex Saab, a Colombian businessman.[1] During his interview with the FBI, Hernandez agreed to assist in the investigation of Bagley. He subsequently provided evidence of the offense, including sham contracts between himself and Bagley, and sham contracts between Bagley and companies controlled by Alex Saab, purporting to justify the fees that Bagley received for onshoring Saab's criminal proceeds.

At the direction of law enforcement, Hernandez met with Bagley on December 4, 2018, to discuss their ongoing agreement to move funds into the United States for Alex Saab. In the conversation, which was audio recorded, Bagley and Hernandez discussed the fact that the funds involved in the scheme represented the proceeds of a foreign bribery scheme. Bagley, in particular, made statements indicating his awareness not just of the general existence of the scheme, but also the specifics of how it operated. After Hernandez stated that "all the money from [Alex Saab] … all that money is from corruption … it's dirty money," Bagley responded by saying "Yes. It is corruption." Bagley then provided additional detail, stating that "[Alex Saab] is in deep in the importing of food … of food into Venezuela. And they have imported the worse quality products with inflated prices, and they have filled their pockets with money."

---

[1] The Southern District of Florida charged Saab with laundering the proceeds of violations of the Foreign Corrupt Practices Act related to Venezuelan government. *See United States v. Saab*, No. 19 Cr. 20450 (S.D. Fla.). Saab was recently returned to Venezuela as part of a prisoner swap. *See* https://apnews.com/article/venezuela-maduro-saab-detained-americans-biden-d7148a34dd009d5bab3d5f50c28ed93e.

## B. Guidelines Calculation

The Government believes that the Guidelines apply as follows to Hernandez's offense conduct:

**Offense Level**

1. The November 1, 2023 edition of the Guidelines Manual is applicable in this case.

2. Pursuant to U.S.S.G. §§ 2S1.1(a)(2), the base offense level applicable to Count One is eight, plus the number of offense levels from the table in U.S.S.G. § 2B1.1 corresponding to the value of the laundered funds. Pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because the amount laundered was more than more than $1,500,000 but no more than $3,500,000, the offense level is increased to 24.

3. Pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because the offense is a violation of 18 U.S.C. § 1956, increase by 2.

4. Pursuant to U.S.S.G. § 4C1.1, because Hernandez meets the criteria set forth in subdivisions (a)(1)-(10) of U.S.S.G. § 4C1.1, a two-level reduction is warranted.

5. Because Hernandez clearly demonstrated acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, because Hernandez has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because Hernandez gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 21.

**Criminal History Category**

Based upon the information now available to this Office (including representations by the defense), Hernandez has no criminal history points.

In accordance with the above, Hernandez's Criminal History Category is I.

**Sentencing Range**

Based upon the calculations set forth above, Hernandez's Guidelines range is 37 to 46 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining Hernandez's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 21, the applicable fine range is $15,000 to $150,000.

### C. Personal Background and Criminal History

Hernandez, 56, was born and raised in Colombia. In the 1990s, he operated an import/export business, in which he occasionally bribed Colombian customs officials to allow cars entry into and exit out of Colombia. He then became involved in transporting cocaine in speedboats from Colombia throughout the Caribbean. Hernandez started in low level positions, picking up money and managing the speedboats, among other tasks. In or around 1999, he became a "transporter," who oversaw the safekeeping of the drugs and transportation in speedboats. Hernandez had a boat captain, sailors, and mechanics who reported to him. He received large quantities of drugs from cartels and paramilitary organizations, and map coordinates for where the drugs needed to be shipped. In total, Hernandez estimates that he transported approximately 10,000 kilograms of cocaine for ultimate shipment to the United States, and that he personally earned approximately $3 million in profits.

In 1999, Hernandez got married and had a child shortly thereafter, and he became concerned about the risks to his family from continuing in the drug business. In particular, he and a rival drug dealer, Cesar Cura, became involved in a dispute. Cura threatened Hernandez and his family, and on one occasion Hernandez's bodyguards exchanged fire with Cura's bodyguards.

In 2000, Cura ordered a hit on Hernandez. However, the hit man informed Hernandez, who offered the hit man double the money to instead kill Cura, which the hit man did.[2] Shortly after this episode, Hernandez turned himself in to the DEA, disclosing his involvement in drug trafficking and his prior acts of violence.[3] The DEA agreed to sign him up as an informant. Hernandez fled Colombia in 2000 and, in April 2001, came to the United States with his family on a DEA-sponsored visa. Hernandez initially worked with the DEA's Fort Lauderdale, Florida office and received incentive payments for seizures of narcotics and bulk currency. He testified before a grand jury in Washington D.C. in approximately 2001.

In 2004, Hernandez began working for Operation Panama Express, a long-running DEA operation based in Tampa, Florida, aimed at interdicting maritime drug shipments throughout the Caribbean. Hernandez recruited and managed informants throughout the world who provided information about drug trafficking. Hernandez had an office and was paid approximately $9,000 per month for his work on Panama Express. In 2008, the DEA deactivated Hernandez as a source. Hernandez believes this was because of disputes between Hernandez and his DEA-agent handler. Hernandez sought to transfer his work as an informant to New York, where a former Panama Express supervisor was working. When his handler learned this, he sent Hernandez an email saying that the DEA had blacklisted Hernandez and could no longer work as a source. He also threatened in that email to have Hernandez arrested for obstruction of justice.[4]

---

[2] Hernandez was involved in two previous homicides in Colombia, both of which the Colombian authorities determined to be acts of self-defense.

[3] Hernandez had provided information to the DEA informally beginning in 1998.

[4] The Government has interviewed another DEA employee who largely corroborated Hernandez's understanding of why he was deactivated as a source.

The DEA's deactivation memorandum, which Hernandez never saw, alleged that Hernandez was deactivated for three reasons: (i) revealing the identity of a source; (ii) giving an interview to Colombian media in which he outed himself as a DEA source; and (iii) failing to follow his handler's instructions. None of those reasons were specifically identified in the email Hernandez received from his handler.

As a result of his deactivation, Hernandez lost his lawful immigration status in the United States. In 2009, fearing deportation from the United States, Hernandez left for Venezuela while his family remained in the United States. He illegally entered the United States through the southwest border in March 2010. He was eventually apprehended and held in immigration custody for several months, during which time a United States Marine Corps intelligence officer heard about Hernandez and attempted to extort Hernandez by threatening to have him deported. Hernandez reported this to the FBI, and subsequently worked with the FBI on an undercover operation that resulted in that officer being arrested. In 2013, Hernandez obtained withholding of removal under the Convention Against Torture due to his credible fear that he would be retaliated against for his past role as a government informant if he returned to Colombia. From approximately 2014 until the FBI approached him, Hernandez worked as an informal source for the DEA and other law enforcement agencies.

## Cooperation and Significance of Assistance

Hernandez provided significant assistance on numerous investigations and prosecutions. First, he cooperated in the investigation of his own money-laundering conduct. In proffers with the Government, Hernandez explained that the source of the funds coming into the United States was Alex Saab, and that █████████████████████████████████████ ███████████. Saab would send Hernandez money because Hernandez ran a lawyer-referral service, under which Hernandez found and remitted payment to attorneys for Saab. The attorneys then paid Hernandez a fee for the referral. However, a large portion of Saab's funds went to █████████ ████████████████████████████████████████████████████████████ ████████████████████████████.

Initially, Saab sent the funds to accounts Hernandez controlled, but Saab began to express concern about sending the funds to Hernandez because Hernandez's work for the DEA was publicly known and could put Saab in danger. As a result of this concern, Saab and Hernandez brought Bagley into the scheme. Bagley drew up a phony consulting agreement, stating, falsely, that Bagley was being paid to provide consulting services to Saab. Hernandez provided this contract to the Government, as well as communications with Bagley relevant to the money-laundering scheme.

Hernandez's most significant cooperation in the Bagley investigation was proactive work he did at the direction of the FBI. As discussed above, Hernandez made several recordings with Bagley, including one in which Bagley discussed the fact that Saab's money derived from "corruption." In addition to these recordings, Hernandez arranged for two additional transactions with Bagley in December 2018 and January 2019. Hernandez told Bagley that these transactions would involve crime proceeds, after which the funds were wired to an account set up by Bagley,

and Bagley then paid the money to Hernandez and took a ten percent commission.[5] As a result of Hernandez's cooperation, the Government was able to charge Bagley with one count of money laundering conspiracy and two substantive counts of money laundering. *See United States v. Bagley*, 19 Cr. 765 (JSR) (Dkt. No. 2). Bagley pled guilty to the two substantive counts and was sentenced to six months' imprisonment. *Id.* (Dkt. No. 24).

Second, in early 2019 Hernandez informed the FBI that John Costanzo Jr., a DEA supervisor from Miami, Florida, was providing confidential information about DEA investigations to Manuel Recio, a former DEA agent working as a private investigator, and two defense attorneys—David Macey and Luis Guerra. Hernandez reported that Recio, Guerra, and Macey used that information to identify and approach targets of DEA investigations, before those targets were publicly identified or charged, and recruit them as potential clients. In October 2018, Recio attempted to recruit Hernandez into the scheme. Hernandez understood, primarily through rumors, that Costanzo was paid for this information.

The FBI asked Hernandez to record calls and meetings with Recio and Guerra, which he did on many occasions. In those conversations, Guerra and Recio discussed the inside information they had received from Costanzo. This information included the dates of arrests and indictments. In one meeting, Recio told Hernandez that they could not use the information before indictments were unsealed, which would arouse suspicions, but that they would be ready to recruit clients as soon as the indictments were unsealed.

Based on Hernandez's recordings, the Government obtained a Title III wiretap on Recio's and Guerra's phones. Eventually Costanzo and Recio were charged in *United States v. Costanzo and Recio*, 22 Cr. 281 (JPO). That case proceeded to trial in October 2023. Hernandez testified at trial about his prior work with the DEA, his work as an informal source for Costanzo, his knowledge about Costanzo's relationship with defense attorneys, and his proactive cooperation against Costanzo and Recio. The jury convicted Costanzo and Recio on all counts.

Third, Hernandez began working with FBI agents in San Juan, Puerto Rico to collect intelligence regarding maritime shipments of narcotics departing Guajira, Colombia for the Greater Caribbean. This included recruiting other confidential informants for the FBI. Hernandez's assistance resulted in six maritime drug interdictions, as detailed below. The FBI has identified additional transportation networks through sources Hernandez introduced to the FBI.

| DATE | NARCOTICS SEIZED | ARRESTS |
|------|------------------|---------|
| ████ | ████ | ████ |
| ████ | ████ | ████ |
| ████ | ████ | ████ |
| ████ | ████ | ████ |

---

[5] Bagley's original business account had been deactivated in October 2018, so Bagley set up a new account for these transactions.

[6] This interdiction resulted in no seizures or arrests, but did lead to significant intelligence.

[7] The smugglers were treated as search and rescue survivors.



| | | |
|---|---|---|
| Totals | **4220 kilograms of cocaine** | **21 smugglers** |

Fourth, since October 2023 Hernandez has been providing intelligence ███████ ████████████████████████████████████████████.

Finally, Hernandez provided cooperation and information about other activity that, while generally truthful, the Government was unable to charge. Most significantly, Hernandez cooperated

███████████████████████████████████████████████████████████████████████████

## Section 5K1.1 Factors

Section 5K1.1 of the Guidelines sets for five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance:

**(1) Significance and usefulness of the defendant's assistance**

Hernandez's cooperation was nothing short of extraordinary. Often cooperators in this District only provide information about the scheme in which they participated. Hernandez certainly did that. His cooperation gave the Government an unassailable case in a significant prosecution in which a professor and self-proclaimed money laundering expert laundered millions of dollars into the United States. That alone would merit serious consideration under the 5K1.1 factors. But that is by no means the most significant part of Hernandez's cooperation. Hernandez singlehandedly uncovered a serious bribery scheme involving high-ranking current and former DEA agents leaking information about top DEA targets. Without Hernandez's initial information, the investigation likely never would have begun. And Hernandez's recordings provided the Government a pathway to obtaining additional incriminating evidence, including intercepted phone calls and seized electronic data. Hernandez continued his cooperation by testifying at length against Costanzo and Recio at trial, including aggressive cross-examination by two defense attorneys, who had made his credibility the focus of their defense.

In addition to all of that, Hernandez provided information leading to thousands of

kilograms of seized cocaine and over twenty arrests of smugglers. This is consistent with the work Hernandez did during his time as an informant on Operation Panama Express. The interdiction of thousands of kilograms of cocaine helped, in some measure, disrupt the flow of narcotics into this country and the groups that facilitate that flow.

### (2) **Truthfulness, completeness, and reliability of any information or testimony**

In the Government's view, Hernandez has been forthcoming regarding his own conduct, his past experiences both as a drug transporter and a DEA source, and the limits of his own knowledge of criminal activity. The Government always made sure that his information was corroborated and has not found any material discrepancies between the information that Hernandez provided and other evidence it collected. Moreover, in preparation for his trial testimony, the Government conducted a complete review of his DEA source file, which corroborated the information he provided about how he became a DEA source and what kind of information he provided to the DEA.

### (3) **Nature and extent of the defendant's assistance**

The nature and extent of Hernandez's cooperation weigh strongly in favor of a sentence reduction. For years, Hernandez was in constant contact with the FBI as he provided information about ongoing criminal activity and conducted proactive work at the FBI's direction. This included FBI agents both in New York and in Puerto Rico. Additionally, when it appeared that Hernandez's trial testimony was necessary, he traveled to New York at his own expense and spent weeks meeting with the Government in preparation for trial. Between the FBI and the U.S. Attorney's Office for the Southern District of New York, Hernandez has met with the Government dozens of times in Miami, New York, and elsewhere.

### (4) **Any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance**

As far back as his time with working with the DEA, Hernandez and his family have experienced harassment, threats, and violence as a result of his cooperation with the Government. Hernandez successfully obtained immigration status under the Convention Against Torture after an Immigration Judge determined that he would likely face torture or death if he returned to Colombia. After Hernandez's work as a DEA informant became publicly known, his brother was murdered in Brazil, which Hernandez believes was retribution for his cooperation.

His cooperation with the FBI has also caused him considerable risk and hardship. His cooperation with the FBI was first publicly disclosed during Bagley's plea allocution, which the Government believes Bagley did intentionally to place Hernandez under scrutiny. If that was his intent, it succeeded, as Hernandez faced constant press in Colombia and other parts of Latin America regarding his work with the Government. For example, when Saab was extradited to the United States in October 2021, numerous social media posts appeared threatening Hernandez and his family for his work with the Government. Shortly before trial began in the bribery case, Fortune Magazine published an article about the case that largely focused on Hernandez, whom the article

described as a "DEA snitch."[8] Last week, an article in the Colombian press claimed that Hernandez was responsible for the case against Saab, which places him at further risk given Saab's close connection to Venezuelan President Nicolas Maduro. There is no doubt that Hernandez's decision to cooperate with the Government has changed his life in ways that he and his family will continue to deal with long after his criminal case ends.

(5) **Timeliness of the defendant's assistance**

Hernandez agreed to assist the FBI the day they approached him and has not since wavered from that commitment. Moreover, because Hernandez brought additional criminal conduct to the FBI's attention in a timely manner, the Government was able to investigate that conduct while it was happening, which greatly strengthened the cases the Government was able to charge.

## Conclusion

In light of the facts set forth above, and assuming Hernandez continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to request at sentencing, pursuant to Section 5K1.1 of the Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Hernandez in light of the factors set forth in Section 5K1.1 of the Guidelines.

Because of the sensitive nature of the information contained in this letter, the Government respectfully requests that it be filed under seal.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Sheb Swett
Assistant United States Attorney
(212) 637-6522

cc:     Silvia Piñera-Vazquez, Esq.

---

[8] Joshua Goodman and Jim Mustain, "The FBI Flipped DEA Snitch 'Bowling Ball,' and He's Blowing the Lid Open on Miami's 'White Powder Bar' of Cocaine Lawyers," *Fortune Magazine*, Oct. 11, 2023 (*available at* https://fortune.com/2023/10/11/fbi-investigation-dea-snitch-miami-white-powder-bar-drugs-cocaine/).